UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHELE BRANT,<br><br>          Plaintiff,<br><br> -v-<br><br>COUNTY OF DUTCHESS and<br>DUTCHESS COUNTY BOARD OF ELECTIONS,<br><br>          Defendants. | Case No. 05-CV-10590 (KMK)<br><br>OPINION AND ORDER |

<u>Appearances</u>:

Russell A. Schindler, Esq.
Kingston, NY
*Counsel for Plaintiff*

Karen Folster Lesperance, Esq.
David Lewis Posner, Esq.
McCabe & Mack LLP
Poughkeepsie, NY
*Counsel for Defendant*s

KENNETH M. KARAS, U.S. District Judge:

   Plaintiff Michele Brant ("Plaintiff") is a staff employee of the Dutchess County Board of Elections (the "Board"). On November 23, 2005, she brought this action naming as defendants the County of Dutchess (the "County") and the Board. The Complaint states a hostile work environment claim on the basis of Plaintiff's gender under 42 U.S.C. § 2000e-3(a)(1). Plaintiff seeks damages of $250,000, attorney's fees and court costs, and unspecified injunctive relief. Defendants move for summary judgment. For the reasons stated in this Opinion, Defendants' Motion for Summary Judgment is GRANTED in its entirety.

I. Background

A. Plaintiff's Employment at the Board of Elections

The Dutchess County Board of Elections is an entity prescribed by New York state law. *See* N.Y. Election Law § 3-200 ("There shall be a board of elections in each county of the state...."). By law, the Board consists of two commissioners, with each major political party eligible to recommend one commissioner. *See id.* The Board institutionally is empowered to hire and manage staff; in addition, each commissioner is permitted to "approve and at pleasure remove a deputy, establish his title and prescribe his duties." *Id.* § 3-300. The Board's Republican Commissioner is David J. Gamache ("Gamache") and its Democratic Commissioner is Frances Knapp ("Knapp").

Plaintiff was hired as a Republican staff member to the Board in or around January 2003. (Defs.' Stmt. Pursuant to Rule 56.1 ("Defs.' 56.1") ¶ 9.) From December 2004 until at least the time of the filing of this Motion, Plaintiff held the title of elections administrator at the Board. (*Id.* ¶ 2.) Prior to that time she was a senior elections specialist and prior to that an elections specialist. (*Id.* ¶¶ 7, 11.)

B. Plaintiff's History with Board Employee Thomas Sassaman

Although not the immediate subject of this lawsuit, the history between Plaintiff and former Board employee C. Thomas Sassaman ("Sassaman") is important background to it. When Plaintiff became employed by the Board, Sassaman was employed there as a Republican staff member. (*Id.* ¶ 9.) Plaintiff and Sassaman developed a close working relationship, were friendly with one another in the workplace, and often ate lunch together and took smoke breaks

together.[1]  (*Id.* ¶ 10.)  In mid or late December 2004, Plaintiff told Gamache that Sassaman had confessed that he had "fallen" for her and that he wanted to take their relationship "to the next level."  (*Id.* ¶ 13.)  In or around December 2004, Gamache effectively swapped the jobs of Plaintiff and Sassaman, promoting Plaintiff to elections administrator and demoting Sassaman to elections specialist.  (*Id.* ¶ 12.)  The Parties agree that the job switch was "for reasons not relevant to the issues in this action."  (*Id.*; Dep. of David J. Gamache ("Gamache Dep.") 15 ("Well, [Sassaman] wasn't doing his job. . . .").)  This personnel move was unwelcomed by other staff members, some of whom liked Sassaman, and some of whom felt Plaintiff should not have been promoted. (Dep. of Michelle Brant ("Brant Dep.") 112:19, 116:11.)

In early March 2005, Plaintiff again approached Gamache and told him that the situation with Sassaman had escalated.  (*Id.* ¶ 14.)  Plaintiff said that Sassaman had telephoned her at home and at the office from his home on his days off.  (*Id.*)  She told Gamache that Sassaman was making her uncomfortable and that she felt like he was stalking her.  (*Id.*)  On advice from Gamache, Plaintiff documented her claim in writing.  (*Id.* ¶ 15.)  Gamache spoke to Sassaman about the allegations, and also notified the Dutchess County Sheriff's Office, which conducted its own investigation.  (*Id.* ¶ 16.)  Based on these investigations and Sassaman's admissions in course, Sassaman was given the choice in late March 2005 to resign or be terminated; he resigned effective April 1, 2005.  (*Id.* ¶ 18.)

C. Sassaman's Letter to the Dutchess County Legislature

On or about April 11, 2005, Sassaman delivered a letter to several members of the Dutchess County Legislature ("April 11 letter"), including then-minority leader Roger Higgins.  (*Id.* ¶ 19.)  In the April 11 letter, Sassaman described himself as a "disgruntled employee" who

---

[1] At least one Board staff member testified that it was a flirtatious relationship. (Dep. of Kimberly Ferese ("Ferese Dep.") 12:17-13:22.)

was "discriminated against based on [his] age," was "harassed" by Gamache and Brant, had his rights violated, and had his "character brought into question." (Aff. of Karen Folster Lesperance ("Lesperance Aff."), Ex. D at 3.) The letter contained a series of detailed and salacious allegations about the purported professional misconduct of Gamache and the supposed personal misconduct of Plaintiff, including extramarital affairs. Sassaman wrote that he was "considering all legal options at this time." (*Id.*)[2]

Prior to sending the April 11 letter, Sassaman showed a draft of it and/or discussed its contents with Knapp and with Board employees Kim Ferese ("Ferese"), Jeanne Short ("Short"), and Bill Frazier ("Frazier"). (Defs.' 56.1 ¶ 36.) Sassaman also mentioned the letter to Board employee Lynn Nippert ("Nippert") and said he would show it to her. Although Nippert did not see a draft before it was sent, she later was shown a copy of the letter by Short, who had obtained it from either Sassaman or Knapp. (*Id.* ¶ 37). When the letter was received by the various legislators to whom it was addressed, news of its existence spread rapidly throughout the Board's office. (*Id.* ¶ 22.)

D. Ballo Acquires a Copy of the Letter

John Ballo ("Ballo") was Democratic Deputy Commissioner of the Board when Sassaman sent his April 11 letter. (*Id.* ¶ 23.) Ballo was, at that time, the senior Democratic staff member in the office because Knapp was on vacation.[3] (Pl.'s 56.1 ¶ 47.) Ballo learned that

---

[2] Sassaman apparently did pursue his "legal options," filing suit in federal district court on June 29, 2006. *See Sassaman v. Gamache*, No. 06-CV-5032. Plaintiff mentions this suit in passing. (Pl.'s Mem. 12.) On May 18, 2007, Judge Charles L. Brieant granted summary judgment to the defendant, a decision from which plaintiff has appealed.

[3] Ballo was formally vested with the powers of Democratic Commissioner in Knapp's absence. (Dep. of John Ballo ("Ballo Dep.") 12:20-22.) He had, however, only temporary tenure in such powers, he kept in close contact with Knapp while she was away from the office, and he would consult with Knapp as a matter of practice about any major decisions being made by the Board. (*Id*. 37:2-8.)

some of the county legislators had received a letter from Sassaman attacking Gamache, and called the legislature to seek to obtain a copy. (Defs.' 56.1 ¶ 23.) Ballo was told by administrative staff that the letter was being widely discussed, but that he would have to contact a recipient for the letter. (*Id.* ¶ 24.) Ballo called Roger Higgins, the county legislature minority leader, who faxed a copy of the letter to Ballo. (*Id.*)

### E. Ballo's Handling of the April 11 Letter

The Parties dispute the facts of Ballo's handling of the letter once he received it. Defendants state that Ballo showed the letter to only three people: (1) Ian MacDonald, County Attorney; (2) Lynn Raver, Board employee; and (3) Curtis Forbes, County EEO Officer. (Defs.' 56.1 ¶¶ 25-28.) Plaintiff alleges that Ballo "made several copies of the letter and distributed the letter to [Plaintiff's] co-workers." (Pl.'s Mem. at 4.)[4]

### F. Workplace Environment Following Distribution of the April 11 Letter

Plaintiff contends that she experienced "sexual comments, jokes, and ridicule at the workplace," which she attributes to Ballo's alleged distribution of the April 11 letter. (Pl.'s

---

[4] Plaintiff seeks to rely on statements that Ballo allegedly made to Dutchess County Sheriff's Office Detectives Stelmach and Wilkinson that he had made several copies of the April 11 letter and distributed it to his and Plaintiff's coworkers. (Pl.'s Mem. 4.; Pl.'s Stmt. Pursuant to Rule 56.1 ("Pl.'s 56.1") ¶ 50.) Ballo gave deposition testimony that he had neither spoken with Stelmach and Wilkinson about the letter nor made copies of the letter. (Pl.'s 56.1 ¶¶ 51-52.) The police statements on which Plaintiff seeks to rely present a classic hearsay problem. *See* Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). At oral argument, Plaintiff's counsel struggled to identify an appropriate exception through which this key evidence could be introduced. *Cf.* Fed. R. Evid. 803(8) advisory committee's note ("Police reports have generally been excluded except to the extent to which they incorporate firsthand observations of the officer."); *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 908 (2d Cir. 1991) ("We hold that a hearsay statement contained in a police report would not be independently admissible at trial. . . ."). Although Ballo's alleged statements to the detectives are plainly hearsay, they could be used as prior inconsistent statements to impeach testimony Ballo might offer at trial. On a motion for summary judgment, however, the Court construes disputed facts against the moving party and thus, for purposes of this motion only, assumes that Ballo made wider distribution than he has admitted in his deposition.

5

Mem. at 4.) Plaintiff, however, stated at her deposition that she could not remember any of her coworkers making a sexual joke of which she was the subject. (Brant Dep. 222:11.) In fact, Plaintiff gave deposition testimony that she remembers very little about specifics, except for a single joke by Frazier that Plaintiff did not take to be offensive. (*Id.* 228:16-229:12.) Regardless of whether he received a copy of or information about the letter from Ballo, Frazier had previously received a copy of the letter and/or discussed it with Sassaman himself. (Defs.' 56.1 ¶ 36.)

## II. Discussion

### A. Standard of Review

Summary judgment may be granted where it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must view all evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmovant's favor. *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "The motion 'will not be defeated merely . . . on the basis of conjecture or surmise.'" *Id.* (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4

(2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). The materiality of the facts considered by the court is governed by substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the court is not charged with weighing the evidence and determining its truth, but only with determining whether there is a genuine issue for trial. *See Castro v. Metro. Transp. Auth.*, No. 04-CV-1445, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006); *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.,* 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990). A court's goal should be to "isolate and dispose of factually unsupported claims. . . ." *Celotex Corp.*, 477 U.S. at 323-24.

### B. Hostile Work Environment Claims

Plaintiff asserts a claim for hostile work environment predicated on her gender. Specifically, Plaintiff alleges that she was subjected to a hostile work environment at the Board as a result of Ballo's "distributing copies" of the April 11 letter, causing Plaintiff to become "the subject of sexual comments, sexual jokes, rumors, harassment, and ridicule by her co-workers." (Compl. ¶ 18.) It bears emphasis, however, that when pressed at oral argument, Plaintiff's counsel had great difficulty identifying what the sexual harassment was. In particular, counsel waffled between suggesting that the harassment was found in Ballo's alleged distribution of the letter and that it was found in the unspecified jokes allegedly made by Plaintiff's other coworkers, most of whom received or learned about the letter from Sassaman himself, regardless of whether they also received or learned about it from Ballo.

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer — (1) to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . ." 42 U.S.C. § 2000e-2(a). "The purpose of this provision is to prevent 'disparate

7

treatment of men and women in employment.'" *Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). The courts have interpreted a claim under this provision as requiring demonstration of two elements: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of . . . [Plaintiff's] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Id.* at 221 (citations and internal quotation marks omitted); *accord Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).

The first element of a hostile work environment claim itself has two components: (1) objective; that is, "'the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment;'" and (2) subjective; that is, "'the victim must also subjectively perceive that environment to be abusive.'" *Petrosino*, 385 F.3d at 221 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)). Here, Plaintiff has alleged the subjective component, claiming that she suffered "shame, humiliation, emotional distress and loss of reputation," (Compl. ¶ 23). Defendants do not challenge that at this stage, instead asserting that summary judgment is appropriate because the conduct alleged by Plaintiff does not satisfy the objective element.

Plaintiff states that Defendants' contention is "without merit," but does not offer much relevant evidence to the contrary. First, Plaintiff complains about Sassaman's April 11 letter. (Pl.'s Mem. 8.) Because Sassaman had, by the time of his authorship of the letter, been required to resign from employment with the Board, his conduct in sending such letter cannot be deemed workplace misconduct. Second, Plaintiff points to a copy of the April 11 letter having been anonymously mailed to her husband at the residence she shared with him. (*Id.* 9.) There is,

however, no evidence attributing this to Defendants or any their employees. The only alleged *workplace* misconduct for which Plaintiff has produced evidence is Ballo's allegedly-wide distribution of the April 11 letter and the jokes allegedly made as a result. Plaintiff points to evidence she suggests shows that the distribution of the letter caused men to make comments to her about whether they were among her extramarital suitors, caused the Board atmosphere to be "tense" and "hostile," and led to alleged jokes and "whispering" by Plaintiff's coworkers, (*id.* 8-9).

To maintain a hostile work environment claim, Plaintiff "'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment.'" *Alfano*, 294 F.3d at 374 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)); *accord Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23 (1993). The Supreme Court has "set forth a non-exclusive list of factors" to consider, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance. . . .'" *Raniola v. Bratton*, 243 F.3d 610, 620 (2d Cir. 2001) (quoting *Harris*, 510 U.S. at 23). The test is at bottom one of "totality of circumstances," *Meritor*, 477 U.S. at 69, within which a court is to look at "the quantity, frequency, and severity of the incidents" in order to "obtain a realistic view of the work environment," *Richardson v. N.Y.S. Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) (internal quotation marks omitted) (abrogated on other grounds by *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 2414 (2006)). Further, the Second Circuit has reminded district courts that "'the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable.'" *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000) (quoting *Richardson*, 180 F. 3d at 439).

Considering the totality of the circumstances, Plaintiff has not raised a triable issue of fact as to the existence of a single incident so severe as to alter the conditions of her working environment, even if any misconduct could be imputed to her employer. Further, Plaintiff has not made any showing that the alleged hostility in her work environment was on account of her gender. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at *discrimination* . . . because of . . . sex." (internal quotation marks omitted)); Barbara Lindemann & Paul Grossman, I *Employment Discrimination Law* 808 (3d ed. 1997) ("Harassment of *a woman* does not necessarily amount to *sexual* harassment; the plaintiff must show that the harassment was directed at her because of her sex.").

Facially, there is nothing about the apparent bulk of the statements in the April 11 letter, which dealt with alleged extramarital affairs — unpleasant and degrading as many of those statements are — that would cause harm based on gender. Almost all of the statements in the letter are troubling on a gender-neutral basis; that is, they would be equally offensive if said about a man. *See Brown v. Henderson*, 257 F.3d 246, 255 n.3 (2d Cir. 2001) (stating there was "no indication" that mockery of plaintiff's alleged affair with a married coworker "was related to her being a woman"); *see also Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999) ("[A]n environment which is equally harsh for both men and women . . . does not constitute a hostile working environment under the civil rights statutes."). Although Plaintiff's brief articulates a reading by which certain comments in the April 11 letter might be deemed gender-specific, (Pl.'s Mem. 8), the letter itself is not the subject of this lawsuit. And, Plaintiff has not

produced evidence that Ballo's alleged distribution of the letter was motivated by gender animus as opposed to any other animus.[5]

Nor has Plaintiff shown that any ridicule she faced from those who learned about the April 11 letter was based on hostility to her gender. *Cf. Brown*, 257 F.3d at 256 (affirming summary judgment for defendant where there was "overwhelming evidence that the hostility toward [plaintiff] was grounded in workplace dynamics unrelated to her sex"). Plaintiff herself admits that workplace hostility toward her predated the April 11 letter. (Brant Dep. 115:4-117:8.) *Cf. Brown*, 257 F.3d at 256 ("[C]rucially, this overwhelming evidence derives substantially from [Plaintiff] herself, and her own view, clearly expressed, that the harassment was fundamentally the product of a workplace dispute . . . and not from her being a woman."). Further, comments by coworkers about an extramarital affair do not inherently constitute conduct motivated by gender animus. *See id.* (affirming summary judgment for defendant because plaintiff had failed to meet burden of showing sex-based discrimination where "the bulk of the behavior she cite[d], though often highly cruel and vulgar, related either to her union-related conflict . . . or to her purported affair" with a married coworker); *Pasqua v. Metro. Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir. 1996) ("There is not even a hint in the record that any rumors or vulgar statements concerning an illicit relationship between [plaintiff] and [coworker] were made because [of plaintiff's gender]."); *Dellefave v. Access Temps., Inc.*, No. 99-CV-6098, 2001 WL 25745, at *7 (S.D.N.Y. Jan. 10, 2001) ("Even if embarrassing or even humiliating, a statement that an employee is having a consensual relationship with a co-worker cannot be construed as discrimination or harassment on the basis of sex absent some additional showing, such as that the plaintiff was singled out for such comments because of his or her gender.");

---

[5] Subsequent to the initial pleadings, Plaintiff has shifted her theory as to Ballo's motive and now suggests retaliation, which is addressed below.

*Huffman v. City of Prairie Vill.*, 980 F. Supp. 1192, 1198 (D. Kan. 1997) (holding that obscene comments about alleged sexual relationship between plaintiff and another coworker, "although offensive, [were not] made because of plaintiff's sex"). Plaintiff's coworkers reacted to the April 11 letter because of its salacious and lascivious content involving the two subjects of sex and politics. *Cf. Pasqua*, 101 F.3d at 517 ("In addition to what commonly motivates gossip of this type — a fascination with the prurient — perceptions [about workplace dynamics] added fuel to the fire in this case."). These reactions may well have been unpleasant or even painful for Plaintiff (as well as juvenile on the part of those reacting), but it does not make the reactions — or the environment they created — illegal.

Even if some conduct was cognizable under Title VII, Plaintiff's theory for imputing to the Board such alleged workplace misconduct creating a hostile environment is weak, at best. Plaintiff seeks to make much of Commissioner Knapp's vacation at the time Ballo obtained a copy of the April 11 letter. Plaintiff's theory is that Ballo was, by virtue of Knapp's absence, the "Acting Elections Commissioner for the Democratic side of the Board of Elections." (Pl.'s Mem. at 6-8.) Plaintiff then reasons that because an employer can be held vicariously liable for the conduct of its supervisory employees, Defendants here should be vicariously liable for Ballo's conduct in distributing the letter. *See Fairbrother v. Morrison*, 412 F.3d 39, 49 (2d Cir. 2005) (explaining that imputation of employee's liability to employer differs where harassment is attributed to "a supervisor with immediate or successively higher authority" over a claimant (abrogated on other grounds by *Burlington Northern*, 126 S. Ct. 2405)); *Mack v. Otis Elevator Co.*, 326 F.3d 116, 123 (2d Cir. 2003) ("[I]t is only when a 'supervisor with immediate (or successively higher) authority over the employee' has engaged in the complained of conduct,

that the 'employer [may be] subject to vicarious liability.'" (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1988); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1988))).

Yet the facts fail to fill in Plaintiff's argument. Ballo, as Deputy Commissioner, did not have a say in any personnel matters respecting Plaintiff or any other employee of the Board. (Defs.' 56.1 ¶ 39.) By law, the Board is required to "secure in the appointment of [its] employees . . . equal representation of the main political parties." N.Y. Election Law § 3-300. By practice, the Republican commissioner and deputy assigned daily work tasks to Republican staff members and the Democratic commissioner and deputy assigned work to the Democratic staff members. (Defs.' 56.1 ¶ 41.) Ballo, as Deputy Commissioner, did not participate in Plaintiff's employment interview, did not evaluate her work, and did not participate in her performance reviews. (*Id.* ¶ 42.) On a day-to-day basis, Ballo did not assign tasks to Plaintiff, did not oversee her performance of tasks, and did not review or evaluate her work product. (*Id.* ¶ 43.)[6] Plaintiff's sole theory that would make Ballo her supervisor is that, in Knapp's absence, he was "Acting Commissioner" at the time he allegedly distributed the April 11 letter, and therefore "his consent would be required before she could be fired, demoted, or disciplined during the time while Commissioner Knapp was on vacation." (*Id.* ¶ 48.) In short, Plaintiff admits that Ballo was not her supervisor in fact, but contends that he should be deemed her supervisor for purposes of imputing workplace conduct by operation of the law.

Plaintiff's theory appears not to be entirely without support in New York Law. *See* N.Y. Election Law § 3-300 note 9 (McKinney 2007) ("A deputy election commissioner shall possess the powers and perform the duties of his principal during the absence or inability of his principal to act." (citing 1966, Op.Atty.Gen. (Inf.) 145)). Still, given the lack of dispute as to whether

---

[6] All of this is illustrated by Democratic Commissioner Knapp's limited role in Republican Commissioner Gamache's decision to effect a job swap between Plaintiff and Sassaman.

13

Ballo exercised supervisory authority in fact, especially in the partisan-split, special environment of the Board, this Court has great skepticism as to whether Ballo could be deemed Plaintiff's supervisor for purposes of this Title VII claim. As a matter of practice, Ballo would not have made a staffing decision without consulting with Knapp, who would in any case defer to Gamache on staff changes with respect to Republican staff members, as she did with respect to the November 2004 job swap between Plaintiff and Sassaman. Nevertheless, the Court need not, and does not, decide this question.

Plaintiff's claim fails regardless because she has not alleged discriminatory conduct that, even if imputable to her employer, is sufficiently severe and pervasive to itself constitute a hostile work environment.[7] Certainly, a single incident may be enough to constitute unlawful harassment. *See Alfano*, 294 F.3d at 374 ("[I]t is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace."); I *Employment Discrimination Law* 795 & n.240. But Ballo's alleged conduct here — the single incident of distributing the April 11 letter to some number of Board staff members — is not the type of single incident that itself constitutes unlawful harassment. "A hostile environment claim that does not involve unusually 'severe' conduct normally will require a showing of multiple instances," and this "is particularly likely to be the case with respect to

---

[7] Again, the Court need not and does not decide whether Ballo's alleged conduct would be attributable to his employer. If he was Plaintiff's supervisor, Plaintiff is correct that such imputation would be automatic. *See Fairbrother*, 412 F.3d at 49; *see also Faragher*, 524 U.S. at 807 ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."); *Ellerth*, 524 U.S. at 762 ("[A] tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer."). If Ballo was not Plaintiff's supervisor, the employer's vicarious liability "depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Fairbrother*, 412 F.3d at 49 (quoting *Petrosino,* 385 F.3d at 225 (internal quotation marks omitted).

verbal utterances. . . ." I *Employment Discrimination Law* 796; *see Alfano*, 294 F.3d at 374 ("As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997))). For example, in *Cosgrove v. Sears, Roebuck & Co.*, the Second Circuit held that offensive remarks by two male coworkers and an offensive anonymous note were not sufficiently severe and pervasive to constitute unlawful harassment. 9 F.3d 1033, 1041-42 (2d Cir. 1993). While Sassaman's letter itself may be severe and might have contributed to a hostile work environment claim had he been a Board employee at the time and had his conduct been unaddressed, it is not the subject of Plaintiff's Title VII claim.

Instead, Plaintiff focuses on Ballo's alleged distribution of the letter and the generally alleged (and unspecified) jokes that Plaintiff claims ensued. The Court, however, cannot see how the alleged *distribution* could have caused a hostile work environment. The Board is not a large office: In April 2005, at the time of the events at issue in this case, the Board had about 12 employees. (Dep. of Frances A. Knapp 5:18; Dep. of David J. Gamache 5:15.) Sassaman himself showed a draft of the letter and/or discussed its contents with Commissioner Knapp and Board employees Ferese, Short, and Frazier. Sassaman also mentioned the letter to Nippert. (Defs.' 56.1 ¶¶ 37-38.) Deputy Commissioner John Kennedy first saw the letter from one of Plaintiff, Lynn Raver, or Ballo (*Id.*) Commissioner Gamache, who was a primary subject of the April 11 letter, gave deposition testimony that he first saw it when "it was either given to me by one of the staff people or it was in my box." (Gamache Dep. at 46:18-19.) Thus, at most, Ballo showed the letter to a handful of Board employees. This cannot, on its own, be the kind of severe single incident that alone gives rise to a hostile work environment claim.

While Plaintiff submits in her brief that the distribution of the letter caused her to experience "sexual comments, jokes, and ridicule at the workplace" (Pl.'s Mem. 4), she has not provided evidentiary support for her claim. In fact, the record overwhelmingly shows that the substance of Sassaman's April 11 letter had spread like wildfire among personnel of the Board and the legislature *after Sassaman himself* had distributed the letter to personnel of each. Therefore, the notion that Ballo was responsible for triggering the rumor mill is folly.

In any event, no reasonable finder of fact could deem the jokes Plaintiff alleges were made at her expense to have been so severe or pervasive as to create a hostile work environment. Plaintiff does not identify particulars of jokes. She cannot say that any such jokes did not result from Sassaman's own distribution of the April 11 letter rather than from any conduct imputable to Defendants, nor that any such jokes were not the consequence of other sources of hostility in the office, such as political tension between Democrats and Republicans or the workplace tension that Plaintiff herself recognized following the reassignment by which she exchanged jobs with Sassaman.

Defendants' Motion for Summary Judgment must therefore be granted as to Plaintiff's hostile work environment claim because Plaintiff has failed to produce triable issues of fact as to: (1) conduct sufficient to create a hostile work environment; (2) any such conduct being on account of Plaintiff's gender; or (3) imputation of alleged hostile conduct to her employer.

C. Retaliation Claim

Although not in the Complaint, Plaintiff's Memorandum purports to argue an additional claim "that the distribution of the April 11th letter by Deputy Commissioner Ballo was an act of retaliation in violation of 42 U.S.C. § 2000e-(3)(a)." The anti-retaliation provision of Title VII prohibits an act of discrimination against an individual because such individual has opposed an

unlawful employment practice under Title VII. *See* 42 U.S.C. § 2000e-(3)(a). Plaintiff's counsel conceded at oral argument that nowhere in the Complaint was a retaliation claim expressed or implied, and he recognized that discovery had been conducted in this case on the understanding that the sole claim was for harassment (and not retaliation). Plaintiff has not moved to amend her Complaint, even to this day — and it is, in any event, too late now. *See United States v. Hougham*, 364 U.S. 310, 316 (1960) (stating that Fed. R. Civ. P. 15 "was designed to facilitate the amendment of pleadings *except where prejudice to the opposing party would result*" (emphasis added)); *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (holding that prejudice to opposing party is determined by whether "the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction" and stating that the longer the unexplained delay, the less is required for a showing of prejudice); *see also McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1130 (10th Cir. 1998) (affirming denial of leave to amend where leave sought one year after initial pleading and five months after discovery cut-off and where plaintiff had full information at time of initial complaint and offered no explanation for delay). Thus, the Court appreciates Defendants' valid concern about lack of notice and opportunity to fully brief this apparent claim. (Defs.' Reply Mem. 9.) Nevertheless, in the interests of "just, speedy, and inexpensive determination of [this] action," the Court will address the retaliation claim. *See* Fed. R. Civ. P. 1.

"To make out a prima facie case of retaliation, an employee must show that the employee was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the protected activity and the adverse employment action." *Collins v. N.Y. City Transit*

*Auth.*, 305 F.3d 113, 118 (2d Cir. 2002) (internal quotation marks omitted); *accord Wilson*, 2005 WL 2385866, at *16 (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). The Court's analysis here focuses on the third element of the claim: the required adverse employment decision.

In the recent case of *Burlington Northern & Santa Fe Railway Co. v. White*, the Supreme Court explained that the "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." 126 S. Ct. at 2414. A plaintiff must show that the challenged action might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (internal quotation marks omitted). The conduct of which Plaintiff complains — Ballo's alleged distribution of the April 11 letter — does not rise to this standard.

For the reasons discussed above, Ballo's conduct probably cannot be imputed to the Board as his employer, given that he likely cannot be deemed Plaintiff's supervisor. But, more importantly, a substantial number of employees in the relatively small Board office had independent knowledge of the existence and contents of the April 11 letter. Plaintiff has not raised a triable issue of fact as to whether the distribution was a sufficiently harmful action to dissuade a reasonable worker from making or supporting a charge of discrimination. The acts that Plaintiff alleges were taken by Ballo– assuming they indeed occurred – may have been disrespectful and unprofessional but, in the context of the Board office, they do not rise to the level of adverse employment action. For this reason, any retaliation claim that Plaintiff could make also fails.

In any event, however, Plaintiff has not made clear — in her papers (on this Motion, that is, as the retaliation claim was not alleged in the Complaint) or through counsel at oral argument

— just what protected conduct she engaged in against which Ballo might have been attempting to retaliate. The nearest thing Plaintiff offers is the characterization of Ballo's deposition testimony that Ballo thought Sassaman had been wronged, but this is not evidence that Ballo was trying to hurt Plaintiff.

Construing all of the pleadings and evidence most favorably to Plaintiff, she is understandably upset about Sassaman's April 11 letter. Nevertheless, for reasons not evident to the Court, Plaintiff decided to sue the Board and the County and not Sassaman. Perhaps she was genuinely motivated by the immature reactions among her coworkers stimulated by Sassaman's letter. None of this, however, alters the necessary conclusion that there is no Title VII case here.

## III. Conclusion

For the reasons stated in this Opinion, Defendants' Motion for Summary Judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion on the docket (No. 11) and to close the case.


SO ORDERED.
Dated:  February 11, 2008
        White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

19

**Service List**

Russell A. Schindler, Esq.
245 Wall Street
Kingston, N.Y. 12401
*Counsel for Plaintiff*

Karen Folster Lesperance, Esq.
David Lewis Posner, Esq.
McCabe & Mack LLP
63 Washington Street, P.O. Box 509
Poughkeepsie, N.Y. 12602
*Counsel for Defendants*